**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-19-00221-CR
NO. 09-19-00222-CR

_____

**EPITACIO CAPETILLO JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 411th District Court**
**Polk County, Texas**
**Trial Cause Nos. 25,967 & No. 25,968**

**MEMORANDUM OPINION**

Epitacio Capetillo Jr. appeals his convictions for the second-degree felony offense of possession of a controlled substance and the state jail felony offense of child endangerment. *See* Tex. Penal Code Ann. § 22.041 (f); Tex. Health & Safety Code Ann. § 481.112(c). Prior to trial, Capetillo filed a motion to suppress. After a hearing, the trial court issued findings of fact and conclusions of law and denied the motion to suppress. Following the trial court's denial, Capetillo pled guilty to both

charges. The trial court sentenced Capetillo to five years of imprisonment for possession of a controlled substance and twenty months for child endangerment, with the sentences running concurrently. Capetillo timely appealed, and in one issue complains the trial court erred by denying his motion to suppress evidence seized following a warrantless search in violation of the Fourth Amendment and article I, section 9 of the Texas Constitution. *See* U.S. CONST. amend. IV; Tex. Const. art. I, § 9. He argues no valid exception to the warrant requirement applied. For the following reasons, we affirm the trial court's order denying Capetillo's motion to suppress.

**Background**

Suppression Hearing

At the suppression hearing, two Polk County Sheriff's Department narcotics detectives testified, as did Capetillo's wife, Enriqueta. Other evidence included video from Detective Lowrie's body camera. Detectives Anthony Lowrie and Christian Schanmier testified they planned to do a knock and talk after receiving a Crime Stoppers tip regarding the use and distribution of methamphetamine at a residence in Polk County, Texas.

Detective Lowrie's Testimony

Detective Lowrie testified that a trailer house "sits to the right of their residence, if you're standing there looking at their residence." Lowrie explained that

2

the Capetillos lived in the "wood-frame residence with a small front porch . . . and a carport to the right[.]" Detective Lowrie testified that upon arrival, he approached the mobile home, and Detectives Schanmier and Hopper went to the other residence. Lowrie testified that while he stood at the front of the mobile home, he heard Hopper speaking to what sounded like a female who said she was locked inside her room. Lowrie testified their focus shifted to the young woman "[d]ue to the circumstance of her being locked in a room as unusual, we didn't know what we had at that time."

Lowrie testified he walked to the rear door of the residence and listened. Lowrie described hearing "a male subject talking with a female, asking where the keys were at[,]" and "a lot of moving around like they're moving objects around to different places[.]" Lowrie said he knocked, but nobody answered the rear door. Lowrie explained that Hopper told him somebody came to the front door, so he walked to the front of the residence where he observed Capetillo and a young female subject on the front porch with Detective Schanmier. Lowrie explained that because the officers still did not know "what we had as far as her being locked in a room, I had her walk over and talk to Detective Hopper while we spoke to Mr. Capetillo." Lowrie testified he was concerned, "because it's unusual to lock a young woman into a room, with all the things going on in the world today with human trafficking and finding females locked in houses that had been abducted." Lowrie testified that they wanted to make sure "that she wasn't actually a victim."

3

Lowrie said Capetillo told Schanmier the young lady was his daughter and had medical issues; Schanmier then asked for Capetillo's identification. Lowrie explained that he and Schanmier followed Capetillo inside to get his identification, as he continued discussing his daughter's health. Lowrie said that he did not feel comfortable allowing Capetillo to enter the residence alone for his identification due to "[t]he female being locked in the room, we don't know what's going on with that." Lowrie said at this point, they did not know how many people were inside. Lowrie testified that the room in question was padlocked on the outside, the young woman's two-year-old child was also locked inside the room, and they would not be able to exit the room without outside assistance.

Lowrie testified that once inside the home, he focused his attention on the rear of the house in an area near where he heard the earlier conversation and a lot of movement. Lowrie testified they had enough to "clear the residence, make sure there are no other people locked in rooms, for one; and to try to verify nobody was hiding, which would explain all the movement[.]" Lowrie testified that when he asked Mrs. Capetillo if anybody was in the back room and if he could check, she consented.

Lowrie described the rear room as "kind of cluttered[]" and explained he had to use his flashlight to see in the corners. Lowrie testified that as he walked into the room, to the left of most of the clutter there was what appeared to be a nightstand, and "[o]n top of that nightstand was a clear baggie with some crystal substance in

4

it." Lowrie testified he took possession of it, "because it was in plain view[]" and he did not open any drawers or move anything to see it. Lowrie explained he then returned to the living room where the Capetillos waited with Schanmier. Lowrie had everyone exit the residence, then field tested the substance, which came back positive for methamphetamine. Capetillo denied permission when Lowrie asked to conduct a more thorough search of the home, so they obtained a warrant.[1]

Lowrie explained that when they arrived and found a girl claiming to be locked inside the residence, they were worried about her rather than the narcotics tip. Lowrie testified they did not advise the Capetillos about the drug tip before going to the back room, because they were still trying to determine why they locked the girl in the room. He mentioned being concerned about human trafficking, unlawful restraint, or kidnapping and the possibility of other victims. Lowrie said they were not obligated to take Capetillo's account of why he locked the girl in the room as true without making sure that nobody else in the home needed help.

Detective Schanmier's Testimony

Schanmier testified that he approached the front door to knock, while Detective Hopper waited at a window near the right of the home. While Hopper

---

[1] The trial court admitted the search warrant into evidence at the suppression hearing.

stood near the window, a young woman spoke to Hopper through the window and advised she was locked in her room.

Schanmier testified that initially, nobody answered the door when he knocked, which concerned him in the context of the woman claiming to be locked inside, and "it raised some suspicions as to what was going on in the residence[.]" He explained that when a question arose about someone being held against their will, that became their focus, and the narcotics tip went "to the wayside." When Capetillo eventually came to the front door, he talked to Capetillo about the lady and asked for Capetillo's identification. Schanmier said he went inside with Capetillo to get his identification as Capetillo explained his daughter "had a head injury" and why they locked her inside.

Schanmier recalled that Lowrie asked for consent to go to the rear of the residence, due to a question about whether others may have been locked in the house like the girl. Schanmier testified that while Lowrie went to the rear of the house, he stayed with the Capetillos. Schanmier testified that Lowrie "came out holding a small baggie, which appeared to be some methamphetamine."

Schanmier explained that Mr. Capetillo advised him that his grandson was also in the locked room, and at some point, someone retrieved the child from the room. Schanmier testified that after Lowrie found the baggie, they had everyone exit the residence into the front yard and continued trying to verify why the woman was

6

locked in the room "to make sure the story added up . . . under those circumstances." Schanmier testified he would not have allowed Capetillo to go inside the residence alone, due to concerns for officer safety and not knowing who else was inside the residence.

<u>Enriqueta Capetillo's Testimony</u>

Capetillo's wife, Enriqueta, testified that she was in her bed asleep when the officers arrived. She said her husband came to the bedroom and told her he heard their daughter talking to someone through the window, and he was going to see who it was. She testified that none of the detectives went into all the rooms of the house, and she only gave Detective Lowrie permission to make sure nobody else was in the home.

Enriqueta confirmed that in an emergency, their daughter and grandson could not get out on their own and agreed the situation was dangerous "[i]n certain ways[.]" She testified that nobody threatened her or pointed a gun at her and that the officers "asked questions[.]" Enriqueta explained that she was scared because the officers did not say what was going on and stated that "they were too concerned and asking us about our daughter, why was our door locked, why was she knocking on the window."

7

<u>Body Camera Footage</u>

The officers' testimony was consistent with Detective Lowrie's body camera video footage played for the court. The video showed Lowrie walking to the trailer as two other officers approached the house. It also showed one officer speaking through a window at the corner of the house, inquiring about why someone was locked inside and who locked them inside. Capetillo and a young woman are seen at the front door where the officers immediately separate them. The young woman stays outside with one officer, while Lowrie and Schanmier enter the house as Capetillo explains his daughter's medical condition. As Capetillo retrieves his identification, Lowrie asks his wife if anyone else is in the home and asks if he can check the back of the house. Capetillo's wife can be heard to consent.

The video also shows Lowrie walking to the back of the house and shining his flashlight in an open room, where he retrieves a small plastic baggie from a nightstand. After everyone exits the home and Lowrie field tests the substance in the bag, Lowrie advises the Capetillos of the field test results. He then asks for consent to search the residence, which Capetillo denies and tells Lowrie to obtain a warrant. The remaining video footage shows the officers outside with the Capetillos and Lowrie calling to obtain a warrant.

Findings of Fact and Conclusions of Law

The trial court denied Capetillo's motion to suppress and entered findings of fact and conclusions of law, including the following:

F3. On October 18, 2017 officers with the Polk County Sheriff's Department received a Crimestoppers' tip regarding the distribution of Methamphetamine at a residence situated at 162 Edmond Street in Goodrich. RR 16

F4. Deputies Ant[h]ony Lowrie, Christian Schanmier and Jacob Hopper traveled to the location to investigate the tip. RR 18. Portions of the event described herein were captured upon a body video recording. State's Exhibit 1.

F5. Upon arriving at the wood frame residential dwelling, Deputy Hopper approached the front bedroom of the dwelling and was alerted by a female subject that she was locked in her room. RR 20.

F6. Deputy Lowrie approached a door near the rear of the residence and [heard] talking from within and movement as if people were moving objects around. RR 21.

F7. Shortly afterward, Epitacio Capetillo appeared at the front door of the residence and was met by Deputy Schanmier. RR 22.

F8. A young female subject also appeared at the front of the residence and was identified as the subject claiming to have been locked in the room. She was requested by officers to exit the residence for additional questioning and to determine if she was possibly the victim of human trafficking or abduction. RR 22-23.

F9. Deputy Schanmier asked Epitacio Capetillo for identification which [Epitacio] Capetillo was unable to produce stating that it was inside the residence. When Epitacio Capetillo requested to retrieve his identification from within the residence, officers permitted him to do so but accompanied him inside the residence for their safety. RR 23-24.

F10. As officers entered the residence, they were met by Epitacio Capetillo's wife, Enriqueta Capetillo who admitted to having locked their daughter inside her room. RR 24-25.

F11. Concerned over whether other individuals might be inside the residence and the earlier conversation heard from inside the rear portion of the residence, Lowrie requested consent to search the residence which Enriqueta Capetillo agreed to. Upon entering the rear portion of the residence and with the aid of his flashlight, Lowrie located a quantity of apparent methamphetamine in plain view. RR 28-29.

F12. Upon discovering an apparent controlled substance, officers cleared the residence and requested consent to search the remainder of the residence and consent was denied. Thereupon the officers remained outside the residence until a search warrant could be obtained (State's Exhibit 2). RR 31.

F13. Upon clearing the residence, it was discovered that a two year old child was sleeping in the front room which was previously locked with a padlock. RR 65.

C1. Upon arrival at the residence in question and discovering a female subject claiming to be locked inside her room, officers were justified in making a warrantless entry into the residence to look for other potential victims under the emergency doctrine and community care taking doctrine. *Laney v. State*, 117 S.W.3d 854 (Tex. Crim. App. 2003).

C2. Additionally, officers were justified in making limited entry into the residence for officer safety when Epitacio Capetillo requested to be permitted to retrieve his identification.

C3. Although not needed due to the circumstances aforementioned, officers also requested and were given voluntary consent to search the residence by Enriqueta Capetillo.

C4. The video evidence contained in State's Exhibit 1 reflects that the suspected methamphetamine discovered by Det. Lowrie was located in plain view and was not the product of an illegal search.

C5. After discovering the contraband, officers obtained a search warrant based upon probable cause which justified a continued search of the residence.

C6. Defendant's Motion to Suppress Evidence is without merit and is hereby denied.

## Standard of Review

"In review of a trial court's ruling on a motion to suppress, an appellate court must apply a standard of abuse of discretion and overturn the trial court's ruling only if it is outside the zone of reasonable disagreement." *Martinez v. State*, 348 S.W.3d 919, 922 (Tex. Crim. App. 2011) (citation omitted). We apply a bifurcated standard, giving almost total deference to a trial court's determination of historic facts and mixed questions of law and fact that rely on witnesses' credibility but a de novo review to pure questions of law and mixed questions that do not depend on credibility. *See id.* at 922–23 (citation omitted); *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). Where, as here, a trial court issues findings of fact and conclusions of law, we view the evidence in the light most favorable to the ruling and determine whether the evidence supports those findings. *See State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We sustain a trial court's ruling if it is "reasonably supported by the record and correct on any theory of law applicable to the case." *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003).

11

**Analysis**

The Fourth Amendment and Article I, Section 9 of the Texas Constitution protects citizens from unreasonable searches and seizures. *See* U.S. CONST. amend. IV; Tex. Const. art. I, § 9. Generally, "a search of a person's home is unconstitutional absent a warrant obtained on probable cause." *Laney v. State*, 76 S.W.3d 524, 528 (Tex. App.—Houston [14th Dist.] 2002, *aff'd*, 117 S.W.3d 854 (Tex. Crim. App. 2003) (citing *Reyes v. State*, 741 S.W.2d 414, 430 (Tex. Crim. App. 1987)). The State has the burden of proof to justify the warrantless search of a residence. *Brimage v. State*, 918 S.W.2d 466, 482 (Tex. Crim. App. 1994); *Janicek v. State*, 634 S.W.2d 687, 691 (Tex. Crim. App. 1982).

Police officers may make warrantless entries and searches if they reasonably believe that a person within needs immediate aid. *See Shepherd v. State*, 273 S.W.3d 681, 683–84 (Tex. Crim. App. 2008); *see also Mincey v. Arizona*, 437 U.S. 385, 392 (1978). "Under the emergency doctrine, the officer has an immediate, reasonable belief that he or she must act to 'protect or preserve life or avoid serious injury.'"[2] *Laney,* 117 S.W.3d at 861 (quoting *Mincey*, 437 U.S. at 392). An officer may enter

---

[2] Distinct from the exigent circumstances doctrine, this applies to the officers' community caretaking role rather than their "crime-fighting" role. *See Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008); *Laney v. State*, 117 S.W.3d 854, 860 (Tex. Crim. App. 2003).

12

and search a private residence for that limited purpose if it is objectively reasonable. *See id.* at 864.

In determining whether a warrantless search is justified under the emergency doctrine when an officer acts in a community caretaking role, we examine the officer's conduct using an objective standard, taking into consideration the facts and circumstances known to the police at the time of the search. *See Laney*, 117 S.W.3d at 862; *see also Shepherd*, 273 S.W.3d at 683–84. The reasonableness of the emergency entry is judged by the circumstances as they existed at the time of the decision to enter rather than by what is found inside. *See Shepherd*, 273 S.W.3d at 684; *Janicek*, 634 S.W.2d at 691. When assessing the objective reasonableness of officers' inferences from facts, we may consider their training and experience in similar situations. *Shepherd*, 273 S.W.3d at 684. "If a search is justified under the emergency doctrine, the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." *Id.*

Detectives Lowrie and Schanmier testified that when they initially went to the Capetillo residence, they planned to do a knock and talk based on the Crime Stoppers tip they received regarding methamphetamine manufacturing at the residence. However, the video evidence and the officers' testimony established that upon arrival, a young woman told Detective Hopper through a window that she was locked inside and could not get out. Both officers testified that their focus shifted at that

13

point to ensuring the woman's safety and verifying nobody else was locked inside. Even Capetillo's wife confirmed the officers' concern for their daughter when they entered the home.

The video evidence and officers' testimony established that they immediately separated Capetillo and his daughter to ascertain the lady's condition and determine why she was locked inside. As Capetillo explained, officers followed him into the home so he could retrieve his identification. Given his continued concern that others may be locked in the residence, Lowrie wanted to check a darkened area in the back of the home where he heard voices and movement. Although unnecessary given the circumstances, before Lowrie did so, he obtained the consent of Capetillo's wife, which is captured on video. When Lowrie shone his flashlight in the darkened area, he spotted a plastic baggie on a nightstand in plain view and retrieved it. The officers did not seize any other evidence or perform further searches after Lowrie checked the back area of the home. Instead, he had everyone exit the residence and waited to conduct a further search until he obtained a warrant.

Because evidence in the record reasonably supports the trial court's factual findings, we will sustain the trial court's ruling if it is correct on any theory of law applicable to the case. *See Laney*, 117 S.W.3d at 857. Given the officers' knowledge that a young woman was locked inside the home, the trial court could have reasonably concluded that they were justified in executing a warrantless search

14

based on the emergency doctrine and specifically pursuant to their community caretaking role. While Lowrie lawfully searched for others in the residence, he found a baggie with a suspicious substance in plain view and seized it. *See Shepherd*, 273 S.W.3d at 684. We overrule Capetillo's sole issue.

## Conclusion

We conclude that the State established the emergency doctrine applied in this case which justified the officers' warrantless search of the residence and seizure of a bag of methamphetamine in plain view. We overrule Capetillo's issue and affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on February 1, 2021
Opinion Delivered March 10, 2021
Do Not Publish

Before Golemon, C.J., Kreger, and Horton, JJ.

15